The next matter, No. 25-2077, LUMA Energy LLC et al. v. Puerto Rico Dep't of Consumer Affairs et al. At this time, would counsel for the appellants please come to the podium and introduce themselves on the record to begin? Thank you, Your Honors. This is David, excuse me, I'm David Horniak. I represent the LUMA parties. Your Honors, I'd like to reserve two minutes for rebuttal, with your permission. You may. You may proceed. May it please the Court. LUMA operates a system pursuant to a contract with PREPA, the public company debtor in these Title III proceedings. And this appeal presents a question of statutory interpretation. The question is whether DACA's lawsuit against LUMA, PREPA, and the Puerto Rico Energy Bureau, seeking to invalidate a term of that contract and an action by the Puerto Rico Energy Bureau pursuant to that contract, is an action or proceeding by a governmental unit to enforce such governmental units, police and regulatory power. Isn't there a prior question as to whether you have an ability to appeal the ruling in this case? It seems to me we have one opinion of our own in which we say we throw a lot of shade on the issue of anyone other than the debtor being able to appeal, calling it problematic. And then there's case law elsewhere that does allow, anyone other than the debtor, does allow a creditor, but only when the creditor is protecting their position vis-a-vis other creditors. So what authority is there to say that you have the ability to appeal this order? Sure, Your Honor. I'm happy to address that. Counsel, before you do, let me add another wrinkle to the question. Appellate review in bankruptcy cases is essentially confined to final decisions. We don't do interim appeals. The statutory language is that you have to be an aggrieved party. As Judge Keada has just said, you don't fit the usual aggrieved party thing. But in addition, we have our own circuit case law going back to the San Juan Hotel case, 1987, Judge Torreo's opinion. And it's a little difficult to distinguish that case which said there is no appellate jurisdiction under like circumstances. So as you answer, could you include a discussion of why you think we do have appellate jurisdiction? Yes, I'd be happy to, Judge Lynch. Judge Keada, let me start with the case you cited, the one referring to jurisdiction as problematic. And that relies on the Ninth Circuit's decision in In re Pecan Groves. That rose out of a Chapter 7 case where the movement below in that case was the trustee lost the motion to enforce the automatic stay and then chose not to appeal. And at that point, a third-party creditor sought to intervene and appeal on behalf of the trustee. And that is where the Ninth Circuit said in that context, the creditor did not have standing to take over for the trustee. Courts subsequent to Pecan, and that similar situation is what occurred in the, I believe it was the American Express case that Your Honor was referring to, similar situation where the movement below chose not to appeal and then a creditor attempted to intervene and appeal instead. And here the debtor has not appealed and the creditor is instead appealing. Well, Your Honor, the creditor was the movement below. Right. But you're a creditor, you're not the debtor. The debtor chose not to appeal this. That's correct, Your Honor. And the, but again, the creditor was the movement below. No one questioned the creditor standing below. And courts around the country have recognized Pecan Groves and its statement that only debtors have standing to appeal as limited to its particular facts. And there are numerous cases we've cited in our reply brief addressing this, including, and I'll just, I'll quote one example, International Forex, which occurs in the Ninth Circuit. It's a district court case stating that, in this court's view, In re Pecan Groves' holding has been overstated for the proposition that the automatic stay is solely for the benefit of the debtor. This court finds ample authority for the proposition that the automatic stay is intended to benefit creditors as well as debtors. The question that I raised is, okay, let's assume that even though it's problematic, you can have appeals by a creditor. When? And the suggestion when I look at the cases seems to be when the creditor, generally a pre-petition creditor, is harmed vis-a-vis the position of other creditors. You know, the bankruptcy proceeding is supposed to introduce some orderly disposition so that there's not a race by the creditors, and the order interferes with that. Here, we don't have that. Judge Chiara, I think you have run straight into the question that Judge Lynch raised, and I'd like to address that. I believe the applicable standard is the El San Juan hotel standard, Your Honor, the aggrieved party standard, which states that the question is whether the LUMA is aggrieved because the order diminishes LUMA's property, increases its burdens, or impairs its rights. And so we believe that is the applicable test here, and that's the question the court needs to answer is were LUMA's rights impaired, were its burdens increased, or was its property diminished by the order? That can't be the standard, can it? Because a LUMA driver could get in a car accident, and someone could bring a claim in the Puerto Rican court that harms LUMA's interests, and yet I don't think you would argue that that would be subject to the stay. Well, I don't think in that instance, Your Honor, LUMA would have moved – there would have been a basis to seek enforcement of the stay in the first place. So the fact that the underlying action poses harm to LUMA cannot be sufficient, then? Well, Your Honor, I don't know that that's true, and I don't mean to fight the hypothetical, but if the underlying action – if the test was, well, the underlying action only threatens LUMA's interest, and therefore LUMA doesn't have a standing to appeal, then no creditor would ever have standing to appeal, and I don't think that's what the case law says. Well, the creditor would have standing if the action that they were seeking to have stayed threatened the creditor's position vis-a-vis other creditors. Well, it does here, Your Honor, and it does for a couple of reasons. So first, it does because LUMA is a creditor by virtue of its post-petition contract with PREPA. That contract was negotiated carefully and struck a careful balance of rights that LUMA has and obligations that LUMA has, and the action here specifically attacked that balance of rights and obligations. It changed LUMA's rights as a creditor vis-a-vis PREPA. It increased LUMA's burdens and reduced LUMA's benefits. Secondly, it also caused LUMA to become a further creditor of PREPA by virtue of the indemnification claims that we've addressed in our briefing, and I know opposing counsel has claimed that this is a speculative chain of causal events, and I would submit to Your Honors that it's not and that it's already occurring. LUMA is already facing these lawsuits seeking damages. Here's another thing that's puzzling me, and maybe you can help on it. It seems to me since the day this contract was signed, in fact, even before, your client knew that there was going to be an issue as to the effectiveness of the waiver. You're going to get challenged sometime, and the contract understandably lets your client out. You're not fully bound yet, as I understand the party's description of the status. So how does it hurt your client to get a decision now on that issue from the Puerto Rican Supreme Court as opposed to staying that proceeding, waiting until things are over, and then getting an issue, particularly when you know now what the ruling is going to be? Sure, Your Honor. So I think we can only focus on the ruling that's right in front of us right now. While PREPA is in Title III proceedings, this ruling has a particular effect on LUMA's rights and obligations vis-a-vis PREPA as well as LUMA's ability to seek indemnification from PREPA. Once PREPA is out of Title III proceedings, we're just dealing with a different situation, different financial circumstances for PREPA, a different environment, and that's what the automatic stay is for. It's not meant to prevent permanently lawsuits from going forward. It is to preserve the status quo that exists during the pendency of these Title III proceedings so that the balance of creditors' rights, the balance of rights vis-a-vis the debtor, don't change. Give me an example of how your client is harmed today, now knowing what the Supreme Court view is, as opposed to waiting until after this bankruptcy proceeding is over, and then getting a decision from the Supreme Court that says the same thing. Sure. Well, Your Honor, one example would be seeking indemnification from PREPA and ability to obtain that indemnification now in the context of these proceedings versus later once PREPA is out of Title III and, for example, has access to capital markets. But I also – I, again, hesitate to fight the hypothetical, but who knows what courts will do down the road. I mean, Your Honor's hypothetical presumes that the Puerto Rico Supreme Court will do the same thing when PREPA exits Title III, and it may. But it also may not. What do you mean it may not? The ruling is based on the Constitution of Puerto Rico. If the court were faced with this same question later, you honestly think they are going to reverse course? Your Honor, I hesitate to say it, but we've seen it happen before in various courts around the country. And, again, I'm not suggesting that I know what the Puerto Rico Supreme Court will do. But all we can do is focus on the ruling that's right in front of us right now. Yes, well, I'm still questioning appellate jurisdiction here because it is true San Juan used the phrases that you have just argued, but they're merely descriptive phrases to capture what happened in that case. I'm back to my why shouldn't we think of this as a sort of interlocutory appeal that doesn't meet any of the usual criteria. There is no finality here. There is no sense of these issues having been determined. And, of course, you will have to bear the considerable cost of defending against court actions in the two class action cases pending against your client. But that wasn't enough in San Juan. And we don't know the outcome of those. We don't know how those will affect indemnity. We don't know as yet how LUMA is disadvantaged compared to other creditors. And these issues can be resolved later when we know more. So, Your Honor, I would respond to that by saying that that same reasoning would also apply to any time a debtor appeals from the decision not to enforce the automatic stay. So if treating this as an interlocutory appeal that can't be appealed were the court's decision, then I believe that would foreclose ever appealing denials of enforcement of the automatic stay. Your Honors, I see my time is up. I know we have not reached the merits. I'll address that with Your Honor's permission in my rebuttal. Thank you. Thank you, Counsel. At this time, would Counsel for the Apolli-Puerto Rico Department of Consumer Affairs please introduce himself on the record to begin? Mr. Toomey? Peter Friedman on behalf of DACA. You may proceed. Thank you. May it please the Court. I wanted to address something that Counsel for LUMA said, which is the only thing the Court should be focused on is Judge Swain's ruling. And I think that's wrong because Judge Swain's ruling did not actually cause LUMA any harm. Its real quarrel is with the Puerto Rico Supreme Court's decision. That is the decision which invalidated a contractual provision. That is the decision that opened up the possibility that LUMA in the future might face liabilities. That's what caused LUMA's harm. All Judge Swain's decision did was decide what's the proper forum in which a case should be heard. It cannot be an injury to a party to have a case heard in a different forum for purposes of appellate standing where it is not the statutory beneficiary of the underlying right. Remember, the automatic stay protects debtors and their property. Here, the consequence of Judge Swain concluding that the automatic stay was inapplicable is simply that LUMA got to attempt to defend its rights and its interest in a debtor contract in a different forum, a forum that LUMA in the OMA, which is part of the record, actually agreed it would be subject to in matters related to the OMA as a contractual matter. LUMA can't claim that it's injured in the manner necessary for appellate standing to exist by Judge Swain's ruling. And I think in particular, Judge Lynch, you mentioned the Al San Juan case. The Al San Juan case is very clear that simply being a defendant is not sufficient to bring about the kind of direct harm necessary for appellate standing to exist. Judge Chiara, you referenced the Shearson case. There's actually another case that this court mentioned, P. Cannon Groves, in a somewhat favorable manner, actually in the context not of the automatic stay, but in the context of the PROMESA stay under Title, I believe, 5 of PROMESA or Title 4 of PROMESA. I think that's the BASOSA case. But it is a second reference to the validity of P. Cannon Groves. Well, you know, I'm actually unwilling to accept a broad statement that, oh, if you could go to another court and make the same arguments, that that alone defeats appellate jurisdiction. What happened here is the government of Puerto Rico basically approved the contractual clause that LUMA put into its OMA agreement because the power lines in Puerto Rico had been neglected for years. They did not want to take on liability for any negligence or injuries. But then a new administration comes in and the new administration campaigns to get into office on the basis that LUMA is terrible, we want them out of here, and we don't like PROMESA anyway. So this is not the usual situation. Here, the government of Puerto Rico has essentially changed its tune, and the financial management board, which is running PROMESA, has said, look, what's at stake in this case on the merits really is whether Puerto Rico will continue to have uninterrupted power through the only contractor that there is. So I think I need better arguments as to why there is no appellate jurisdiction than merely, oh, they can go to the ports of Puerto Rico and they're not prejudiced by doing that. Your Honor, respectfully, for appellate jurisdiction purposes, I don't dispute that the board, as PREPRA's representative, might have had appellate jurisdiction, would have been able to appeal. The board didn't appeal. Can I ask you why, in your view, didn't they? I have no idea. The board chose not to appeal. What it actually said below, according to LUMA, was it actually had no view on the underlying merits of the suit DACO had filed. That's what Judge Swain was told. Additionally, Your Honor, there are different entities within the government of Puerto Rico that took – PREB is an independent regulatory agency, right? So the government of Puerto Rico as a whole can't be conflated into the entity that approved the liability waiver. They are distinct entities. With respect to the appellate standing, again, if the board as debtor had tried to invoke the provision to the automatic stay, it could have said, look, we've suffered a specific statutory harm as the debtor. Appellate standing, it would not be a valid defense to say the harm is not redressable because they can vindicate their rights in a different court. But when a creditor or another party that's not the actual beneficiary of the stay – Back to Judge Keada's point. But that's also partly a basic standing point. And I noticed that the Title III court did not rule that they had no standing. It went directly to the merits. It did, Your Honor. And I think that's because Section 1109, the bankruptcy code, is different than appellate standing. Section 1109 has been interpreted broadly to grant parties an interest, a right to be heard on matters. Courts are absolutely uniform, that the standard for 1109 standing as a party in interest is vastly different than appellate standing. I also want to address a different issue, Your Honor, that I think in some ways is a merits question that was embedded in your standing question, which is, should you be concerned about the fact that there may be some consequences in the LUMA governmental relationship? And I think the answer is, first of all, not as a matter of Title III. The question under Section 362 is police power, not validity of the police power, frankly, not what does the Oversight Board think under Title III. There are different provisions of PROMESA that deal with the relationship between the Oversight Board and the elected government, that if there are matters that pertain to what the board thinks the government is doing, the parties can deal with it under different sections of PROMESA. LUMA is not the superintendent of PREPA in that respect. And Title III actually says, in Section 303, Title III is not about preventing the central government's ability to control its subordinate branches, but for the provisions of Title II, which are purely Oversight Board powers, they give LUMA no powers. And I think Judge Swain correctly concluded that, frankly, policy arguments aren't germane to the police power. And what I'd say is, if you look at this court's jurisprudence, right, Parkview, which Your Honor wrote, a debtor lost its CMS abilities to get Medicare. That had profound consequences for the debtor. Spooky world, right? A debtor got shut down that was a haunted house entity during Halloween. That was bad for it, but that wasn't the question. The question was, was a police power met? The same with Ruiz from 2024. A dairy farmer lost his license to sell milk, right? That definitely had negative consequences for that debtor, but that wasn't the question. The question was whether, under 362b-4, the debtor was subject to a police power action. Now, turning to the police power, one thing I want to mention is, I think in the reply briefs and in the board's papers, there's some suggestion that DACA had to be enforcing its own powers. And there's two answers to that that I wanted to give. The first one is, under 3LPRA Section 341, it isn't. If you look at what the Puerto Rico Supreme Court held, if you look at DACA's organic statute, which, by the way, is an unusual statute, I am told by my brethren from Puerto Rico, very few other Puerto Rico entities have the same scope of regulatory authority. And if you look at Judge Swain's opinion, they all describe what DACA's very broad mandate is. It's to protect consumers. And this is clearly consumer protection. And I also want to cite, to bring to the court's attention, a case that we cited in a footnote and that LUMA actually referenced in its opening brief. And it's the Merrant case from the Ninth Circuit. The attorney general sued Merrant. And Merrant argued it suited under the Clayton Act, right? The attorney general sued Merrant under the Clayton Act. And Merrant argued that, basically, the reference in 362b4 to a government unit's police or regulatory power means that the government in question must be suing in furtherance of its own police and regulatory power. And the Ninth Circuit said, a number of cases make clear that the 362b4 exception extends to a government's enforcement of laws enacted by other governments. So it's clearly not, and it cites about half a dozen cases for that proposition. It is clearly not the case that DACA has to point to a specific regulation or a specific, so that it promulgated in order to be exercising the police power. And the last point I'd make on this is to remember that DACA is part of the Commonwealth government, right? Its powers come from the Commonwealth government. May I finish my question? You can finish your answer. I actually have nothing more to add to that provision. One more question. If Judge Swain had determined that DACA was exercising its police powers and, therefore, was able to obtain protections or be exempted from the automatic stay or had ruled otherwise, in other words, had ruled that the automatic stay applies, is there anything about this case that would have kept Judge Swain from turning around and granting relief from the automatic stay? I would say there's two possibilities. One, we would have certainly moved under a test that does balance the kind of things that Judge Lynch is talking about to move the stay, or we would have sought to certify any issues in the bankruptcy court, the specific legal issue, to the Puerto Rico Supreme Court, which Judge Swain certainly would have been entitled to do. And I think, given that this is a pure issue of Puerto Rico law, she may have. I don't want to guess. But we certainly would have sought that relief. We would have sought lift-stay relief as well, Your Honor. I have nothing further. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the appellee ICSE please introduce himself on the record to begin? Good morning, judges. My appellee is the Court, Fernando Agaray for ICSE. In this case, Luma did not ask the Swain court to hold her decision, to stay her decision that the stay did not apply to the DACA case. It could have done it. It didn't do it. It really did it on the other cases that are coming up on appeal, the termination contract cases. They specifically asked for a stay of the order, of the remanding, and said, Luma, that the reason they were requesting the stay is that the case could become moot if the stay was not granted. And that is, in a way, what has happened here. When the Supreme Court of Puerto Rico acted unanimously and decided that the PREP did not have legal powers to grant an immunity, there was no federal order or federal court limiting that. So now, it's not only whether the stay should have been granted or not, it is that there is a Supreme Court of Puerto Rico opinion on a strictly Puerto Rico constitutional law. There are some comments which I want to make. One, FOMBI does not say, has never said, that Luma has to stay as operator. It has said that a private operator has to be there. Probably, that is why they didn't appeal, because at the end, they don't care as long as there is a private party operating the system. But it's more important. There's not one mention anywhere that the tort cases against PREPA, before Luma, in any manner were responsible for the debacle of PREPA. PREPA debacle was political, was economic, it was incompetence, but it never has anybody, not even Luma, not FOMBI, mentioned that the catastrophe was due to the tort cases. And for 60 years, PREPA operated paying damages for torts. Now, DACO was created in 1973. It has as wide powers, as you can imagine, for any government agency, in this case, in particular, to protect the consumers. The consumers of Puerto Rico has always had a right to sue the provider of electricity for the damages it caused. That's a right of the consumers. And then, Luma and PREP determined that that right didn't exist. Without the participation of the consumers, then it's up to DACO to represent that interest and protect that interest of the consumers. The contract, the O&M contract between Luma P3, as we call it in Puerto Rico, and PREPA does not say that Luma has a right to indemnity. The right that Luma has under OMA is to request from PREP an indemnity. If the only thing you have a right to is to request, it means that the decision can go one way or the other. Aren't you getting ahead of yourself? Excuse me? Aren't you getting ahead of yourself? I might. Anyhow, my time is up. Thank you. Thank you. Thank you, Counsel. At this time, would Counsel for the Appellant please reintroduce himself on the record? He has a two-minute rebuttal. Thank you, Your Honors. David Horniak for the Luma Parties. I'll try to condense my argument on the merits to two minutes. Essentially, the issue here is what the text of the statute says. No one is disputing, at least Luma is not disputing, that DACO has the standing under its organic act to bring the action that it brought. But I think the Fourth Circuit's decision in In Re Royal is instructive here, where they specifically address that issue and say, Look, just because an agency can bring an action under its organic act is not the same thing as whether that agency is enforcing that agency's police or regulatory powers. Now, I know Mr. Friedman says, in fact, the agency can enforce anybody's police or regulatory powers. That's just not our position or our reading of the statute, which numerous courts, I believe including this one, have said it needs to be interpreted narrowly so as not to consume the automatic stay. Are you arguing that they actually had to have regulations in place to enforce? Because that doesn't seem to quite square with the text of the statute, which talks about enforcing their regulatory power, not regulations. Right, Your Honor. No, we're not arguing that. I think we're arguing that they need to be enforcing a law, an affirmative law or regulation or order that's within the scope of their authority. And we have a very unusual situation here, where they are challenging the actions of other governmental units on separation of powers or constitutional grounds. And I am not aware of any authority saying that DACO is the unique keeper of other agencies' scope of powers under Puerto Rico law. And I haven't seen a case to that effect. Every case cited by the appellees here involves closer to the paradigm, which is an agency suing a debtor to enforce environmental regulations that the debtor has allegedly violated or to revoke a license that the agency granted or to terminate a contract that the agency entered into. I've never seen a case like this. I don't think there has been one where you have this internecine fight between governmental units. And that's the issue here. I see my time is up. Thank you, counsel. That concludes argument.